IN THE MATTER OF THE 1981 COUNTY OF UNION
JUDICIAL BUDGET IMPASSE.

June 24, 1981.

1

2

*James R. Zazzali*, Attorney General in behalf of Union County Assignment Judge V. William Di Buono. *Joan Robinson Gross*, Deputy Attorney General, appearing.

*Robert C. Doherty*, Union County Counsel appeared in behalf of Union County.

It appearing that an impasse developed between the Assignment Judge and the Board of Chosen Freeholders of Union County regarding the 1981 budget of the Judiciary, and said Assignment Judge having issued a Recommended Disposition pursuant to *R.* 1:33–5(a), and the Board of Chosen Freeholders and the County Manager having filed a Notice of Petition for Review of the matter with this Court, and the Court having granted said petition for review and having referred the matter to a three-member panel for factual determinations and recommendations, and the panel having held hearings on June 4 and 5, 1981 and having filed its report with the Clerk of the Supreme Court on June 17, 1981, and exceptions to the report having been filed and withdrawn by the parties, and the record having been reviewed and good cause appearing;

It is ORDERED that the factual findings and recommendations of the panel are hereby adopted; and it is further

ORDERED that the Board of Chosen Freeholders is hereby directed to amend the 1981 budget of the County of Union to implement the aforesaid findings and recommendations, a copy of which are attached.

Panelists: CHARLES S. JOELSON, LAWRENCE A. CARTON, Jr., and WALTER WECHSLER.

## PANEL REPORT

This is a panel report pursuant to an order of the Supreme Court of May 21, 1981, under *R.* 1:33–5. We conducted hearings

on June 4 and June 5, 1981. The judiciary presented 9 witness-
es, the principal ones being Trial Court Administrator John Miri,
Criminal Assignment Clerk James Brown, Civil Assignment
Clerk Louis Moro, Director of the Juvenile and Domestic Rela-
tions Court Division Robert Fitzpatrick, Chief Probation Officer
Ross Doyle, and Sheriff Ralph Froehlich. The county presented
five witnesses, principally County Manager George Albanese
and Finance Director & County Treasurer Arthur Grisi. Wide
range for cross examination of all witnesses was afforded.
Eighteen exhibits in the form of documents were received from
the judiciary and nine from the county.

In reviewing the order of the Assignment Judge of April 30,
1981, we have applied the test of "whether the appropriation is
reasonably necessary" as directed by *R.* 1:33–5(e). However, in
applying that test, we have considered the "cap" limitations
under *N.J.S.A.* 40A:4–45.4 faced by the county. To decide the
matter wearing blinders to "cap"-related fiscal problems of
Union County would be unrealistic. We are persuaded, and it is
not denied, that the county's 1981 budget as finally approved is
at the limit of expenditures legally permissible. Although we
have not reviewed the entire county budget, unrefuted testimo-
ny by the county indicated that substantial reductions have been
made, including the elimination of numerous positions in county
government generally. We are mindful of the fact that any
substantial increases ordered for the judiciary could result in
corresponding decreases for other important county functions.

While aware of the fiscal problems of Union County, we must
also keep in mind the absolute essentiality that the courts be
enabled to perform their judicial functions to the end that the
administration of justice not be impaired. Maintaining the
delicate balance between these competing considerations is no
easy task. While we are recommending that several of the
appropriations ordered by the Assignment Judge be disallowed,
we deem it only fair to state that in so doing we do not find that
all disallowed appropriations would be wasteful or could not be
used to some advantage. However, as we have indicated above,

we determine reasonable necessity in the context of the county's strained financial conditions. If the taxpayers desire "cap" laws and substantial diminution or elimination of federal assistance heretofore available to support the judicial system, they must be willing to forego optimum conditions.

The following are the recommendations of this panel on the disputed appropriations ordered by the Assignment Judge:

## BUDGET ACCOUNT # 051—SUPERIOR COURTS—PERSONNEL

1. The first item ordered in this account is for an additional Assistant to the Court of Administrator at an annual salary of $18,000 plus fringe benefits. Union County already has a Trial Court Administrator and two Assistants to the Trial Court Administrator. We are satisfied that this complement is adequate to handle the varied duties of the office of the Trial Court Administrator. We do not accept the assessment of the Trial Court Administrator that one of his assistants must devote full time to those duties of the office involving Municipal Courts. Although we have not made an analysis of all the judicial vicinages of the state, we note that Passaic County which, like Union, is a county of the second class has only one Assistant Trial Court Administrator and that Bergen, a county of first class, has only two. The Trial Court Administrator's presentation before us did not disclose any vincinage that has three. We find that with a well delineated division of the duties the Trial Court Administrator's office and precise work assignments, the present number of personnel should adequately handle the workload. Therefore, we recommend that the appropriation for an additional Assistant to the Trial Court Administrator be disallowed.

2. The second item ordered is for two clerk-stenographers: one in the office of the Criminal Assignment Clerk, the other in the office of the Civil Assignment Clerk. According to an affidavit of the Criminal Assignment Clerk, there has been a

63% increase in the number of indictments for the period of January 1 through April 30, 1981, over the same period in 1980. Furthermore, he stated that because of a speedy trial program directed for cases arising out of all municipalities in Union County, the need to gather and collate data is greater and the numbers of forms to be completed and filed has increased. He asserts that as a result, his office is falling behind in its work schedules. The county has not disproved these statements. We find that because of an increased workload in the office of the Criminal Assignment Clerk's office, an additional employee is reasonably necessary. However, the additional employee can be a clerk-typist rather than a clerk-stenographer. Since the Assignment Judge does not seek this additional employee until Sept. 1, 1981 when the new court term begins, we recommend one additional clerk-typist in the office of the Criminal Assignment Clerk effective Sept. 1, 1981. At the prevailing rate on a pro rata basis, this will result in an appropriation of $4,076, including fringe benefits, for the remainder of 1981.

With regard to the Civil Assignment Clerk, his presentation indicated that the workload of his office has increased due to the new early settlement program involving additional lists and extra phone calls, an accelerated disposition program, and a steadily increasing filing of new cases. He further stated that despite the mounting workload, since April 1, 1981, his clerical staff has diminished from five to three employees on a full time basis. The Assignment Judge found it necessary to transfer two clerical employees to matrimonial cases, leaving them to work on civil cases one hour daily on Mondays through Thursday and two hours on Fridays. The slack has partially been taken up by a worker hired under the Comprehensive Employment and Training Act (CETA), but the funding for this employee is about to be terminated.

We find that because of the increased workload and the diminution of personnel in the Office of the Civil Assignment Clerk, an additional employee is reasonably necessary. This employee need not be a clerk-stenographer, but can be a clerk

typist. We, therefore, recommend approval of an appropriation for the clerk-typist effective Sept. 1, 1981, which is the date directed by the Assignment Judge. At the prevailing rate on a pro rata basis that will result in an appropriation of $4,076, including fringe benefits, for the remainder of 1981.

## BUDGET ACCOUNT # 051—SUPERIOR COURTS—EQUIPMENT

1. The Assignment Judge ordered an estimated $900 appropriation for "disc pacs" for a computer. The Trial Court Administrator was under the impression that he could not obtain these disc pacs because of a freeze on the purchase of new equipment. However, it became clear during the course of our hearing that the county has no objection to these items being purchased out of the current budget as "other expenses." Thus, this issue is moot and the order for an appropriation for disc pacs may be regarded as withdrawn. In order that there may be no misunderstanding, we recommend its disallowance.

2. The second item in this account is the order for one additional copy machine and supplies at an estimated cost of $4,500. We find that although the Xerox 3100 presently in the judicial department is hardly adequate to fill the needs of the department, there are other copying machines in the courthouse that can be utilized. One is in the Sheriff's office. Although it would be preferable and perhaps more efficient for the judicial department to have exclusive control over such equipment, we cannot regard an additional copying machine as reasonably necessary in light of the fact that a general freeze on the purchase of new equipment has been imposed across-the-board for all departments and agencies in Union County.

3. This item involves an appropriation directed for one electronic typewriter "for the typing of repetitive letters, reports, orders, etc.," at an estimated cost of $4,500. During the course of our hearing, we were advised by the County Manager that he has such a machine available for the use of the judicial depart-

ment. There was some question whether the availability of this equipment was ever made known to the Trial Court Administrator. At any rate, it is there and the Trial Court Administrator informed us at the hearing that it will reasonably fill the function of the machine ordered by the Assignment Judge. We were surprised to receive a supplemental affidavit from him after the hearing that "it is the opinion of the Assignment Judge that this machine is not an adequate substitute...." However, we rely on the Trial Court Administrator's statement to us rather than on his hearsay statement as to the opinion of the Assignment Judge. Because we find that the available machine possesses capabilities sufficiently close to those of the equipment sought, we recommend disallowance of this item.

### BUDGET ACCOUNT # 059—JUVENILE & DOMESTIC RELATIONS

*COURT–PERSONNEL*

The only item ordered in this account is for the hiring of three additional clerk-typists for the Juvenile and Domestic Relations Court. According to the Director of the Juvenile and Domestic Relations Court Services Division, his operation is faced with a growing workload and a diminishing staff. He stated that based on filings to date in 1981, there will be a 28% increase over 1980, and he has further shown that seven CETA employees assigned to him will be terminated at the end of this month, in addition to which a permanent county clerical employee has already resigned. We find that even before the loss of these employees, the clerical work of the Juvenile and Domestic Relations Court has fallen behind, seriously and adversely affecting the expeditious flow of the work of that court. More than 2,000 cases await final processing because of the lack of typists to prepare final orders. Furthermore, cases are not promptly initiated because there are not enough typists to type notices to the parties. In view of these findings, we are persuaded that the appropriation for these additional clerk-typ-

ists in the Juvenile and Domestic Relations Court is not only reasonably necessary, but is modest. However, since one full time clerical employee has resigned, and we presume that her resignation took place in 1981 when her position was budgeted, it will be necessary to add only two additional positions to the budget. We, therefore, recommend allowance of the order for an appropriation for two additional clerk-typists at a total cost of $11,702 including fringe benefits, effective July 1, 1981. We do so with the understanding that the employee who has resigned will be replaced.

## BUDGET ACCOUNT # 069—PROBATION DEPARTMENT—PERSONNEL

This item deals with additional personnel ordered in the probation department. He directed appropriations for three additional probation investigators, two clerk-typists, one telephone operator-receptionist, and two clerks. With regard to probation investigators, the chief probation officer testified that he needs one additional to replace a CETA employee assigned to the volunteers unit, one additional to replace an investigator transferred from the alcohol unit to the bail unit, and one additional to work in conjunction with the adult pre-sentence unit.

We are not persuaded of the necessity to replace the CETA employee in the volunteers unit. A table of organization introduced into evidence by the judicial department indicates that even without the CETA employee, this unit already has assigned to it a director who is a senior probation officer, a co-ordinator of volunteers, three investigators and a clerk-typist. In addition, it is supervised by the assistant chief probation officer who also supervises the vocational service unit. The functions of the volunteers unit are limited to recruitment, guidance and supervision of the volunteers who actually perform the probation services. In view of this, we are not satisfied of the necessity for an additional investigator to be assigned to the volunteers

unit. We do not have the benefit of a state-wide survey, but we understand that in Passaic County, there is one principal probation officer II, one volunteers coordinator and one clerk-stenographer assigned to the volunteers unit, and that in Bergen County, there is only one principal probation officer and one probation officer. Finding that the unit needs no additional personnel, we recommend that the appropriation for an additional investigator be disallowed.

With regard to the appropriation ordered for an investigator for the alcohol unit, the testimony was that this is needed in order to replace an investigator formerly assigned to that unit, but transferred to the bail unit because of the increased workload there. The table of organization of the department indicates that one probation officer is presently assigned to the alcohol unit. The function of the alcohol unit is limited to placing alcoholic probationers in treatment programs and monitoring their progress. Furthermore, if the chief probation officer wishes, there is nothing to prevent him from assigning to the alcohol unit, either full or part time, one or more of the investigators presently in the volunteers unit. We believe this can be accomplished without impairment of the volunteers unit. Finding that the alcohol unit can meet its needs either with the present personnel or with the aid of personnel from the volunteers unit, we recommend that the appropriation for an additional investigator in the alcohol unit be disallowed.

Concerning the appropriation directed for an additional investigator for adult pre-sentence reports, according to the chief probation officer during the first four months of 1981, the number of investigations assigned has increased by 69% compared to a similar period in 1980. On top of this, twelve CETA personnel employed as investigator trainees have been terminated. We find that the increased workload and the loss of CETA employees make it reasonably necessary for an additional investigator in connection with pre-sentence reports. We, therefore, recommend allowance of the Assignment Judge's order in this

respect at a cost of $7,177 including fringe benefits, effective July 1, 1981.

With regard to clerical personnel, the department has lost five CETA clerk-typists in the face of a mounting workload. We find that the expeditious handling of work will be adversely affected if the two clerk-typists sought should be denied, and that appropriations for them are reasonably necessary. Therefore, we recommend allowance of the appropriation directed for two additional clerk-typists at a cost of $11,702, including fringe benefits, effective July 1, 1981.

Similarly, the department has lost two telephone operator-receptionists employed through CETA. We agree with the opinion of the chief probation officer that the operation of the Plainfield office of the department would be adversely affected without such an employee. However, since a complicated switchboard is not involved, there being only six or seven employees in the office, we believe that this employee should also have time for clerical duties. We consider this fact in determining the need for the two additional clerks requested. With regard to that part of the order of the Assignment Judge directing an appropriation for two additional telephone operator-receptionists, we recommend allowance of an appropriation for one telephone operator-receptionist at a cost of $6,110, including fringe benefits, effective July 1, 1981.

Finally, as to the order for two additional clerks, we are not satisfied that they are reasonably necessary, especially in view of the fact that the additional telephone operator-receptionist allowed above should be available for some clerical work in the Plainfield office and the clerk-typist presently assigned to the volunteers unit should also be available for other clerical duties. We, therefore, recommend that the appropriation directed for two additional clerks be disallowed.

To summarize, we recommend allowance of the Assignment Judge's order for additional personnel in the probation department to the following extent: one investigator, two clerk-typists, and one telephone operator-receptionist.

## SHERIFF'S DEPARTMENT—PERSONNEL

This involves that part of the order of the Assignment Judge directing appropriations for six additional Sheriff's officers and three additional clerk typists in the Sheriff's office. The Sheriff stated that he requires two additional officers for the warrant squad, two for the juvenile section and two "to replace loss of supervision." An annual activity report of the warrant squad for 1980 indicates that the volume of business is increasing at a rapid rate. The warrant squad received 1633 warrants in 1979 and 2031 warrants in 1980. Yet, according to the testimony of the Sheriff, his office had ten persons available to serve warrants in 1979 and only eight in 1980. He further testified that as a result, the warrant squad is falling behind in its work. We find that because of the increased volume of business, the warrant squad needs additional personnel. It is well known that there is no recession in the number of matters connected with the prosecution of crime and the administration of justice in criminal cases. In these areas, unhappily, business is booming. Nevertheless, in reviewing the annual activity report of the warrant squad for 1980, we find that the ratio of warrants cleared in relation to warrants received was not alarming. As a matter of fact, in 1980, 2031 warrants were received and 1986 cleared; in 1979, when 1633 were received, only 1425 were cleared. Furthermore, the Sheriff testified that because of a shortage of clerical personnel in the warrant squad, he has found it necessary to assign a Sheriff's officer to clerk-typist's duties in that squad. An additional clerk-typist will hereinafter be allowed for the warrant squad. In view of this, we are of the opinion that the task can be accomplished by the addition of one additional officer rather than two to handle the anticipated increase in volume.

We turn now to the testimony of the Sheriff that he requires two additional officers for the juvenile courts. We are persuaded from the testimony that the Union County courthouse complex leaves much to be desired from the standpoint of security. Unlike courthouses in some other counties, there are

no elevators devoted solely to prisoners and their guards, nor are there holding cells for prisoners brought in for trial. This results in the need for more Sheriff's officers than might be required where the facilities are better designed for security. We understand that there is some flexibility in the assignment of Sheriff's officers. The continuation and extension of this flexibility whereby Sheriff's officers are not assigned to courts on a fixed basis, but on the basis of day-to-day exigencies, will be helpful. Nevertheless, we find the need for one additional Sheriff's officer to be reasonably necessary to maintain security.

We, therefore, recommend the allowance of an appropriation for two Sheriff's officers—one for the warrant squad and one for courtroom security—at a cost of $17,280 including fringe benefits, effective July 1, 1981.

The remaining item to be dealt with relating to Sheriff's officers concerns the request of the Sheriff for two additional officers to replace loss of supervision. Our questioning of the Sheriff indicated to us that although he wishes to advance two officers to the rank of sergeant, he really does not request that they be replaced. This advancement can be accomplished by him (subject to Civil Service requirements) at a cost of approximately $1,000 each for the balance of 1981. No additional appropriation will be necessary as there should be enough uncommitted and unspent funds available in the judicial department by way of the "slippage" that normally occurs when budgeted positions are vacated due to retirement or other causes.

Finally, with regard to Sheriff's office personnel, the Assignment Judge ordered an appropriation for three clerk-typists. The Sheriff testified that he needed two in the business office and one for the work on the warrant squad. The Undersheriff further testified that the office has lost three CETA clerk-typists in the face of increasing volume. We are persuaded that there is a need for one additional clerk-typist for the work of the warrant squad. In this respect, the Sheriff testified that the operation was so short-handed that he found it necessary to

divert a Sheriff's officer from his regular duties to perform work as a clerk-typist. The providing of an additional clerk-typist would free that Sheriff's officer for the duties for which he is being paid. We find the addition of a clerk-typist to the warrant squad to be reasonably necessary. With respect to the business office, although we do not find that two additional clerk-typists are required, we find that one is reasonably necessary because of the over-all increase of 30% in volume disclosed by the testimony of the Undersheriff. We suggest increased flexibility in the assignment of the clerk-typists in the Sheriff's office so that a pool arrangement responsive to the shifting day-to-day needs of the office can be devised. We, therefore, recommend allowance of two of the three clerk-typists for whom the Assignment Judge ordered an appropriation. The cost will be $11,702, including fringe benefits, effective July 1, 1981.

To summarize, we recommend allowance of the Assignment Judge's order for appropriations for additional personnel in the Sheriff's office to the following extent: two Sheriff's officers and two clerk-typists.

### SHERIFF'S DEPARTMENT—EQUIPMENT

This item deals with an order for an appropriation of $56,000 for seven automobiles. However, we are satisfied from the testimony of the Sheriff that the judge's order was the result of erroneous information inadvertently supplied to him. The Sheriff stated to us that he presently has seven automobiles assigned to him, of which he wanted four replaced. He further said that he needed three additional new automobiles, bringing the total to ten. However, the testimony of the Director of the Department of Central Services in behalf of the county conclusively demonstrated that the Sheriff already has thirteen automobiles assigned to him, including three 1980 vehicles. It is not clear to us why this information was not known by the Sheriff, but when confronted with it, he acknowledged that those thirteen cars would fill his needs. Indeed it would appear that there are three more cars available to his office than he has requested.

We find no necessity whatever for any more automobiles, and assume that this request will be withdrawn. However, to make a clear record, we recommend disallowance of the appropriation of $56,000 directed for the purchase of additional vehicles.

## CONCLUSION

We understand that the Committee on Court Efficiency appointed by the Chief Justice will soon issue its report after months of study. It will address the problem of the efficiency of court-related functions statewide, and we commend it to the attention of the appropriate officials in Union County. We are confident that it is the aim of both the judicial department through the Assignment Judge and the county through the Board of Freeholders and its officers to have an efficient and economical court system.

In recapitulation, we point out that this report recommends that the disputed court order which has been estimated by the county to involve an add-on to the county budget of approximately $225,000 for the balance of 1981 be reduced so that the add-on will be only $73,825. This takes into account the fact that appropriations ordered by the Assignment Judge for equipment in the total sum of $70,400 (including an added $4,500 for operation and maintenance) have been eliminated because we found that the judicial department now has or can obtain this equipment. We believe it reasonable to anticipate that the additional appropriations recommended for approval by us will not result in the necessity for reducing the budgets of any county department or agency that are not court-related. We base this on the fact that in an over-all county budget of more than $36 million for salary and wages, there will be sufficient "slippage" by way of temporarily unfilled vacancies caused by retirement or otherwise which would compensate for the additional judiciary requirements. In 1980, for example, uncommitted balances in the judiciary accounts totalled $467,000.

We are, of course, aware that on an annualized basis, the items added to the budget and recommended for allowance by

us will be considerably greater. However, we can deal only with the 1981 budget. Furthermore, we have no way of knowing whether new construction and improvements within the county will be sufficient to afford the county some welcome breathing space with regard to "cap" limitations.

We note in closing that all our figures as to salary costs are based upon prevailing rates of pay as supplied to us by the county. Should there be changes in these rates of pay (which would only be minor), our figures should automatically be revised accordingly. We also add that after the panel met and decided this matter, we received further submissions from the judiciary, none of which have changed our original determinations regarding the disputed appropriations. All the items in this report referring to clerical personnel were contained in our first draft which was written before we received the additional material from the judiciary. As will be evident, we entertained some doubts as to the current accuracy of some of the material submitted by the county as to the number and productivity of clerical employees, which is chiefly the material dealt with in the supplemental submissions by the judicial department.