In re Vermont Supreme Court Administrative Directive No. 17 and Harriet and Donald Smith, et al. v. The Vermont Supreme Court, The Honorable Frederic W. Allen, The Honorable Louis P. Peck, The Honorable Ernest W. Gibson III, The Honorable John A. Dooley, The Honorable James L. Morse, in their Individual Administrative Capacities as Justices of the Vermont Supreme Court

[579 A.2d 1036]

Nos. 90-102 and 90-122

Present: Gibson, Dooley and Morse, JJ., and Barney, C.J. (Ret.) and Keyser, J. (Ret.), Specially Assigned

Opinion Filed May 31, 1990

*John F. Evers* of *Langrock Sperry Parker & Wool,* Middlebury, *Jerome F. O'Neill* of *O'Neill and Crawford,* Burlington, and *Deborah T. Bucknam,* St. Johnsbury, for Petitioners/Appellants.

*Jeffrey L. Amestoy,* Attorney General, and *Robert W. Gagnon* and *Marilyn Skoglund,* Assistant Attorneys General, Montpelier, for Respondents/Appellees.

**Barney, C.J. (Ret.),** Specially Assigned. Petitioners brought a petition for extraordinary relief under V.R.A.P. 21 seeking a declaration that an administrative directive of this Court ordering the delay of most civil jury trials until after July 1, 1990 for budgetary reasons is unconstitutional. Petitioners were also plaintiffs in a superior court suit seeking substantially the same relief and have appealed the dismissal of that action. We dismiss the petition for extraordinary relief and affirm the dismissal of the superior court action.

On January 11, 1990 this Court issued Administrative Directive No. 17, entitled "Temporary Postponement of Civil Jury Trials," which stated as follows:

The resources available to the Judiciary have been drastically reduced for the remainder of fiscal year 1990. Accordingly, each superior and district court judge and clerk is hereby ordered to postpone until after July 1, 1990 any civil jury case for which the jury has not yet been drawn. The administrative judge is hereby authorized to permit the trial of any given case where justice requires, but it is envisioned that nearly all civil jury cases will be delayed. This directive shall become effective on January 22, 1990.

There is no dispute over the motivation for the issuance of Administrative Directive 17. Financial problems within the State of Vermont caused the Governor and Legislature to order rescissions—that is, reductions in the preexisting appropriations for government agencies. The Governor ordered a 2% reduction in appropriations shortly after the fiscal year began. In January, 1990, the House of Representatives cut the current-year budget of the Judiciary by another $127,000. In anticipation that this further cut in appropriated funds would be adopted by the Senate, as it was, the moratorium was adopted along with a number of other cost-cutting measures because the funds available were not enough to cover the anticipated costs for the judicial department's programs.

In Docket No. 90-122, litigants in thirteen superior court cases throughout Vermont brought individual actions and a class action in the Chittenden Superior Court pursuant to V.R.C.P. 65 and 75, purporting to represent all individuals with civil cases pending in the Vermont superior and district courts and whose cases were, or would be, affected by Administrative Directive 17. Plaintiffs asked the court to declare the Directive invalid and to direct the restoration of civil jury trial cases to the affected calendars. Defendants were the Supreme Court itself, the justices in "their individual administrative capacities," the Court Administrator, and each superior and district court clerk.

The evidence before the superior court was sparse. There was no testimony on the effect of the moratorium on the individual plaintiffs or on the average length of time between readiness for trial and the trial date. There was no proof that any of

the plaintiffs sought, as was explicitly permitted, an exception from the order for their individual cases. An expert witness for the plaintiffs testified that the moratorium would have a significant detrimental effect on the lives of many of the plaintiffs because they will forego needed health care in order to take care of themselves and their families. Administrative Judge Stephen B. Martin testified that of the approximately 400 cases at issue, only a relatively few would be set under the exceptions clause in Administrative Directive 17. He also emphasized that after the moratorium expired on July 1, 1990, an emphasis would be placed on jury work so that he expected any delay in holding jury trials would disappear by January 1, 1991.

Upon completion of the evidence, the trial court granted defendants' motion to dismiss on a number of grounds, including that the superior court lacked authority to grant relief in the nature of mandamus as to an order of the Supreme Court. Although the court did not reach the issue of constitutionality, it concluded that the Directive did not create a blanket moratorium. The present appeal followed.

In addition to the appeal from the superior court decision, the same plaintiffs filed an original action in this Court, Docket No. 90-102, seeking extraordinary relief pursuant to V.R.A.P. 21 and a declaration that the civil jury moratorium was unconstitutional. The complaint described the circumstances of the individual plaintiffs. In two cases, the complaint alleged that a request for an exception from the moratorium had been made but not acted upon. In one case, the complaint alleged that such a request had been denied.

The defendants in this action were the Court and its members "in their individual administrative capacities." In an earlier opinion, this Court denied a motion to disqualify members of the Court from sitting on the case and dismissed the claim against the Justices of the Court as individual parties. We consolidated the appeal in No. 90-122 and the petition for extraordinary relief in No. 90-102 for hearing on May 14, 1990.

Before addressing the specific issues raised by petitioners, it is helpful to set out what this case is *not* about. At argument, the petitioners asserted that this Court has the inherent power

to order the Legislature to appropriate money for "reasonably necessary" expenditures of the Judiciary and could have done so in this case. See Note, *The Courts' Inherent Power to Compel Legislative Funding of Judicial Functions,* 81 Mich. L. Rev. 1687 (1983); see also *In re Union County Judicial Budget Impasse,* 87 N.J. 1, 2, 432 A.2d 807, 807 (1981) (following hearing before fact-finding panel, Supreme Court directed county board to amend budget of county judiciary to implement recommendations approved by the court). While this proposition may be true, no party has sought to bring the legislative or executive branches into this controversy, and the complaints are solely a challenge to this Court's power to issue the Administrative Directive. Thus, the power of the Legislature or of the Governor to reduce the Judiciary's budget is not before us.

Similarly, there is no dispute about the emergency and temporary circumstances that brought about Administrative Directive 17. A retroactive reduction in appropriation to support the courts necessarily means that there must be an immediate reduction in expenditures in some way. On the other hand, as the administrative judge testified, the Directive under challenge is effective only until July 1st, and scheduling after that date can shortly bring the processing of civil jury trials to the point where it would have been if the Directive had not been issued. Thus, this case involves a temporary delay in the availability of civil jury trials, not either a permanent waiting period between readiness for trial and the start of trial or a denial of jury trial.

Having eliminated what is not before us, we can focus on what is before us. For this purpose, we will treat the case before us as the petition for extraordinary relief filed directly in this Court. Except to draw from its limited record, the parties have all but ignored the appeal from the superior court dismissal, which as we indicated above, was not on the merits of the case. Since the superior court appeal adds nothing to petitioners' arsenal, it is unnecessary to treat the jurisdictional and procedural issues raised therein.

At issue in this case are the scope and meaning of the two Vermont constitutional provisions that relate to the availability

of civil jury trials in the State. Chapter I, Article 12 of the Vermont Constitution provides as follows:

> That when any issue in fact, proper for the cognizance of a jury is joined in a court of law, the parties have a right to trial by jury, which ought to be held sacred.

Chapter II, § 38 of the Constitution provides:[1]

> Trials of issues, proper for the cognizance of a Jury as established by law or by judicial rules adopted by the Supreme Court not inconsistent with law, in the Supreme Court, the Superior Court and other subordinate courts, shall be by Jury, except where parties otherwise agree; and great care ought to be taken to prevent corruption or partiality in the choice and return, or appointment of Juries.

The central substantive question before this Court is whether Administrative Directive 17 denies the right to trial by jury or fails to keep it "sacred" as required by Chapter I, Article 12 or Chapter II, § 38.

In order to reach this question, we must find that petitioners are properly before this Court in their V.R.A.P. 21 petition. Extraordinary relief is a flexible procedure that provides an avenue "for relief when other avenues are foreclosed." *Crabbe v. Veve Assocs.*, 145 Vt. 641, 643, 497 A.2d 366, 368 (1985). Thus, the rule specifically requires that the petitioners demonstrate exhaustion of remedies in the superior court. See V.R.A.P. 21(b); *Byrd v. Kehoe*, 136 Vt. 204, 205, 388 A.2d 834, 835 (1978) (per curiam). Petitioners have demonstrated that the avenue of bringing this case to the superior court is foreclosed since their attempt to do so was dismissed. Most, however, have not attempted the alternative avenue of seeking an exception

---

[1] Though not cited by petitioners, Chapter I, Article 4 of the Vermont Constitution is also relevant:

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; conformably to the laws.

from the moratorium from the administrative judge. Indeed, many of the petitioners admit their case is not ready for trial so no relief from the administrative judge could be available.

Petitioners argue that they were not required to seek relief from the administrative judge because the mere existence of Administrative Directive 17 interferes with their protected right, and, in addition, the exception process is standardless and too limited to be an effective remedy. We have been unwilling in the context of reviewing administrative rules to allow a general attack on the validity or application of a rule to be made when fact-specific review through a designated procedure is available. See *In re D.A. Assocs.*, 150 Vt. 18, 19, 547 A.2d 1325, 1326 (1988) (declaratory ruling by agency commissioner on meaning of rule is not available as substitute for appeal of a specific condition contained in permit issued under the rule). We have required exhaustion of a discretionary exception process when plaintiffs were making a constitutional attack on a statute, and have been unwilling to accept the characterization of the exception process as a "futile gesture." See *Choquette v. Perrault*, 144 Vt. 218, 223, 475 A.2d 1078, 1081 (1984) (attack on constitutionality of Vermont fence viewer law); see also *Aiken v. Malloy*, 132 Vt. 200, 214, 315 A.2d 488, 496–97 (1974) (persons challenging due process protections where driver's license suspension was sanction for nonpayment of poll tax were required to exhaust potential remedy before town board for abatement of taxes).

We also believe that the petitioners overstate the effect of the Administrative Directive. We fail to see, for example, how the mere existence of the Directive affects the rights of those whose cases are not ready for trial. The courts are fully open to them for any pretrial proceedings, and they can engage in discovery and pretrial preparation. It is entirely speculative that their cases would come to trial any later than if the Directive never existed. More broadly, we have held in another context that a claim of unnecessary delay in the disposition of a court action requires a showing of prejudice. *State v. Dean*, 148 Vt. 510, 515, 536 A.2d 909, 913 (1987); see also *State v. Hall*, 145 Vt.

299, 307, 487 A.2d 166, 171 (1984) (delay on appeal is a denial of due process only when litigant shows substantial prejudice based on "concrete, practical considerations, rather than vague speculation"). While this holding interprets Chapter I, Article 10 ("speedy . . . trial"), Chapter I, Article 4 ("Every person . . . ought to obtain right and justice . . . promptly and without delay") and Chapter II, § 28 ("justice shall be . . . administered, without . . . unnecessary delay"), we see no reason why petitioners would have any less burden in this case. We do not see how petitioners can show prejudice if they decline to use an avenue that may give them the jury trial they seek.

Although most of the petitioners did not allege that they sought relief from the administrative judge, and many admitted that such relief could not be sought because their case was not ready for trial, three petitioners alleged that they requested an exception from the administrative judge. One of these was denied relief. Since no evidence has been taken in this case and we are dealing, in effect, with a motion to dismiss, we reach the merits of whether a claim for relief has been stated for these three petitioners.

In short, petitioners' position is that a jury trial delayed is equal to a jury trial denied for purposes of the Vermont Constitution. In this case, at least, in the context of a temporary moratorium for the time involved, with an exception from the moratorium available where justice requires, we reject this position.

Our precedents do not support the absolutist view of the jury trial right that the petitioners espouse. Vermont courts have long exercised the power to adopt administrative rules having an incidental effect on the availability of jury trials in some cases. In *Jones v. Spear*, 21 Vt. 426 (1849), defendant debtor protested a county court rule conditioning the right to jury trial upon the furnishing of an affidavit that a money claim was disputable. This Court upheld the rule and rejected the claim that it resulted in denial of the jury trial right:

> In England, where the right of trial by jury is acknowledged to quite as enlarged an extent as in this country, there are many kinds of defences, (which are considered as

technical, and not favored,) which the rules of the courts will not permit to be made, unless the party interposing them will make an affidavit of the truth of such defence, and that the same will be made to appear on trial. And in many of the states, whose constitutions contain similar provisions with ours, their courts have rules like those of the English courts;—but in neither country has it ever been supposed, that the right of trial by jury was thereby impaired or trenched upon.

*Id.* at 430. In *Plimpton v. Town of Somerset*, 33 Vt. 283, 290 (1860), the Court stated that an act is unconstitutional with respect to juries if it "destroys or materially impairs the right of trial by jury according to the course of the common law."

The most significant of our early cases is *Lincoln v. Smith*, 27 Vt. 328 (1855), where the plaintiff challenged the lack of a twelve-person jury in a justice of the peace court. The Court held that the availability of a jury on appeal in the county court cured any deficiency. It reasoned:

[I]t is quite well settled, that if a legislature pass an act giving to a justice of the peace power to hear and decide a cause, without the intervention of a jury, but the act gives the right of appeal to a court which tries causes by a jury, it is no such violation of the right of trial by jury, as to render the act unconstitutional; although had the judgment of the justice been final, it might have been. *Though the party may be put to some expense and inconvenience, yet the right is not taken away, or so far impaired as to render the act void.* The right of appeal is not so trammelled . . . as to clog the exercise of the right, so as to render its enjoyment unreasonable and oppressive.

*Id.* at 361 (emphasis added). The clear import of *Lincoln* is that preconditions to the jury trial right that delay its exercise are not per se unconstitutional.

Although *Lincoln* is an early precedent, cases from other states show that its principles have continuing vitality in addressing modern problems. Thus, in *Pittsburgh Corning Corp. v. Bradley*, 499 Pa. 291, 453 A.2d 314 (1982), the Supreme Court of Pennsylvania upheld a court rule requiring plaintiffs in as-

bestos-related tort cases to first go to trial before a judge in a nonjury trial, after which either party could have a de novo jury trial. The court held that the requirement to go first to trial before a judge did "not unduly burden the parties' right to a trial by jury" in light of the high volume of pending asbestos-related cases. *Id.* at 298, 453 A.2d at 317. Similarly, the Maryland Court of Appeals upheld a statute requiring medical malpractice plaintiffs to go first through nonbinding arbitration before receiving a jury trial, despite the burden on access to the courts and the jury trial right. *Attorney General v. Johnson*, 282 Md. 274, 300, 385 A.2d 57, 72–73 (1978). This decision relies on an early Maryland decision, *Steuart v. Mayor & City Council of Baltimore*, 7 Md. 500, 512 (1855), which is comparable to our decision in *Lincoln v. Smith*. The court also quoted language from another early case to the effect that " 'legislation . . . which merely points out the mode of arriving at this object, but does not rob the right of its essential ingredients, cannot be considered an infringement of the right.' " *Id.* at 301, 385 A.2d at 73 (quoting *Knee v. Baltimore City Passenger Ry.*, 87 Md. 623, 633, 40 A. 890, 894 (1898)).

The decisions in *Jones v. Spear*, *Plimpton v. Town of Somerset* and *Lincoln v. Smith* do not support a holding that a temporary delay in access to a civil jury trial equals a denial of the right. Indeed, they are directly contrary to petitioners' position and, as the recent decisions from other states show, support the view that actions that may delay or condition the jury trial right do not by themselves infringe on that right.

There are other significant impediments to petitioners' position. As we noted above, we have required a showing of prejudice in a claim that delay in litigation denied rights under the Vermont Constitution. See *State v. Dean*, 148 Vt. at 515–16, 536 A.2d at 911. As the cases involving the speedy trial right demonstrate, it is impossible to codify inflexible delay rules, even in criminal cases. The United States Supreme Court emphasized in *Barker v. Wingo*, 407 U.S. 514, 521 (1972), that it is impossible to "definitely say how long is too long in a system where justice is supposed to be swift but deliberate." The difficulties

in determining the outer limits of permissible delay are even greater in civil cases.

> Delay *per se* is not unconstitutional; it may become such only when an injured plaintiff, ready and eager for trial, or a defendant, seeking vindication and himself ready for trial, are denied for too long his day in court. If a five year delay in a civil action reflects simply the parties' utilization of pre-trial discovery or settlement negotiations there is no constitutional violation. To codify the myriad relevant elements into timetables of general application having constitutional force may well be impossible.

*Ad Hoc Committee on Judicial Administration v. Massachusetts*, 488 F.2d 1241, 1244 (1st Cir. 1973).

There have been periods in our history when clogged dockets in our superior court meant that a litigant would wait for a trial date far longer than the same litigant would wait today. Although we have no specific record on this point, we believe that it is likely that the petitioners in this case will have the opportunity to go to jury trial sooner than they would have during periods in the past despite the delay occasioned by Administrative Directive 17. The remedy they seek, however, is the instant access to a jury. Such a remedy cannot be found in the constitutional jury trial rights on which they rely. Petitioners have failed to show specific prejudice or that their trials are being delayed unreasonably. Caseloads cannot be managed on the simplistic position that everyone is entitled to an immediate trial whenever they are ready for one.

Finally, we note that we have given broad authority to trial judges to manage dockets to do justice for all the litigants. Under V.R.C.P. 40(a)(1) a presiding judge can advance or specially assign cases for trial. Scheduling orders are authorized, and are routinely used, to move cases to trial at a rate tailored to the particular case. See V.R.C.P. 16.2. The United States Court of Appeals for the Second Circuit noted:

> Nonetheless, the fact remains that the calendars of the . . . [d]istrict court are clogged and justice is being delayed or perhaps impaired as a result. In order to reduce this choking congestion, the district courts must be permitted to ex-

ercise their discretion in appropriate ways that will ensure justice to all who seek it. We will not interfere with the conscientious judge who will not accept the status quo of calendar congestion.

*Davis v. United Fruit Co.*, 402 F.2d 328, 331–32 (2d Cir. 1968) (footnote omitted). Exercising the broad discretionary power we have given to the trial judges, the superior court in Chittenden County recently decided it would devote a term of court primarily to hearing family cases. Jury trials were necessarily, although incidentally, delayed in that county.

Petitioners appear to accept the inevitability of court congestion brought on by inadequate judicial resources and the actions of trial courts to manage limited resources in the face of overwhelming demand. They would, however, deny this Court the same power to manage limited resources when the limitation comes in response to budget cuts, the existence and authority for which they have not challenged. These are distinctions without significant or meaningful differences.

Under Chapter II, § 30 of the Vermont Constitution, the Supreme Court has "administrative control of all the courts of the state." Chapter II, § 37 requires us to "make and promulgate rules governing the administration of all courts." Court administration necessarily involves managing judicial resources with effects good and bad on the litigants who use our courts.

The real defect in Administrative Directive 17, according to petitioners' argument, is that it directly and visibly moves resources between types of cases to the disadvantage of their particular cases. Presumably, they would find it acceptable to cut judicial staff *with the same resulting delays* because then there would be an indirect but not direct effect on the jury trial right. We fail to see how one action can be constitutional and the other not, if access to jury trials is temporarily delayed in either case. More important, such a constitutional doctrine would reward management by indecision and inaction, with an overall loss to the system. It would encourage this Court to take actions that are the least visible to the public who use our courts instead of forthrightly and publicly responding to a shortage of resources in a way that is accountable to the citizens of this state. We

cannot accept poor judicial management that is commanded by artificial distinctions on which petitioners rely.

There remains only to consider the main precedent relied upon by petitioners, *Armster v. United States District Court for the Central District of California*, 792 F.2d 1423 (9th Cir. 1986), holding that that district court and the district court for the district of Alaska could not constitutionally suspend civil jury trials because of fiscal constraints.[2] *Armster* appears at first blush to proclaim a Seventh Amendment civil jury trial right which is infringed by the slightest diminution:

> We must vigilantly protect the right to civil jury trials, and we must scrutinize in the most rigorous manner possible any action that appears to limit *in any way* the availability of that right.
>
> . . . .
>
> 8 . . . We conclude that the availability of constitutional rights does not vary with the rise and fall of account balances in the Treasury. Our basic liberties cannot be offered and withdrawn as "budget crunches" come and go, nor may they be made contingent on transitory political judgments regarding the advisability of raising or lowering taxes, or on pragmatic or tactical decisions about how to deal with the perennial problem of the national debt. . . . Rather, our constitutional rights are *fixed and immutable*, subject to change only in the manner our forefathers established for the making of constitutional amendments.

*Id.* at 1429 (emphasis added). The court goes on to hold, however, that it is not the moratorium per se that offends the Seventh Amendment, but the *length* of the moratorium:

> Specifically, we conclude that the seventh amendment right to a civil jury trial is violated when, because of such a suspension, an individual is not afforded, *for any significant period of time*, a jury trial he would otherwise receive. We

---

[2] The *Armster* approach has been followed in two other cases, *Hobson v. Brennan*, 637 F. Supp. 173 (D.D.C. 1986), citing the briefs in *Armster*, but decided before the decision in that case, and *Odden v. O'Keefe*, 450 N.W.2d 707 (N.D. 1990) (per curiam), which relies on *Armster*.

do not suggest that a suspension of any duration what-soever would be constitutional. We need only decide here that a suspension for a significant period is barred by the seventh amendment. . . . [W]e believe three and a half months constitutes far more than a significant period, given the mandate of the seventh amendment.

*Id.* at 1430 (emphasis added). The *Armster* court appeared at first to treat the deferral of jury trials in the case before it as a power that had been exercised without the need for justifica-tion, not as an option chosen in the face of competing claims to judicial resources or limited funding. The court's apparent re-sponse was to declare invalid any action that appeared to limit the civil jury trial right "in any way." However, in its holding it conceded that the civil jury right might be limited according to a reasonableness standard not unlike that in *Barker v. Wingo.*

The cases following *Armster* do not contribute to our anal-ysis. The court in *Hobson v. Brennan,* 637 F. Supp. 173 (D.D.C. 1986), found that the Seventh Amendment prevailed over a di-rective of the federal Judicial Conference directing an indefi-nite suspension of the civil jury trial in the case before the court. The court in *Odden v. O'Keefe,* 450 N.W.2d 707 (N.D. 1990) (per curiam), faced with an eighteen-month delay in civil jury trials, found "the rationale of *Armster* . . . to be persuasive to the extent that it prohibits a blanket moratorium on civil jury trials for a *significant* period of time." *Id.* at 709 (emphasis added).

Armster and the decisions relying on it are distinguish-able because they deal with blanket moratoria and, in the case of *Odden,* a far longer time period. We also cannot accept the analysis that the jury trial right is infringed when access to juries is delayed a relatively short period of time. See Bunge, *Congressional Underappropriation for Civil Juries: Respond-ing to the Attack on a Constitutional Guarantee,* 55 U. Chi. L. Rev. 237, 267 (1988) ("The *Armster* court's creation of a speedy civil jury trial right lacks textual and precedential support and should not be used as a basis for challenging congressional un-

derfunding of civil juries."). Finally, we are relying on our own settled interpretations of the nature of the right to trial by jury under the Vermont Constitution. These interpretations do not necessarily apply to the Seventh Amendment to the United States Constitution, which is not applicable to the states.

*Docket No. 90-122 is affirmed; in Docket No. 90-102 the petition for extraordinary relief is dismissed.*